UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIMOTHY BURKE

v.                                    CASE NO. 8:23-mc-00014-WFJ-SPF

UNITED STATES OF AMERICA

**UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION
TO BURKE'S MOTION TO UNSEAL PROBABLE
CAUSE AFFIDAVIT AND FOR RETURN OF PROPERTY**

The United States opposes Burke's motion to unseal the probable cause affidavit and for return of property ("Burke's Motion"). Doc. 25. Burke's Motion requests that this Court: (1) unseal the probable cause affidavit (the "PC Affidavit") submitted in support of a search warrant, signed by this Court, and executed on May 8, 2023, at 5914 N. Tampa Street, Tampa, Florida, 33604 (the "Burke address"); and (2) order the United States to return to Burke all of the items seized from that address, along with any copies of information and data therefrom.

This Court should deny Burke's Motion to unseal the PC Affidavit. As this Court recognized in denying, in part, The Times Publishing Company's ("The Times") motion, the PC Affidavit must remain sealed to protect and safeguard the integrity of an ongoing federal criminal investigation, the safety and security of law enforcement personnel, the privacy of unnamed and uncharged subjects of the investigation, and the privacy of third-party fact witnesses and potential victims.

This Court should dismiss Burke's motion for an order directing the United

States to return all property seized pursuant to the search warrant for lack of jurisdiction. The exercise of such jurisdiction over a pre-indictment criminal investigation is limited to exceptional cases. Under controlling precedent, it requires, at a minimum, a showing that the United States callously disregarded Burke's constitutional rights. Burke's Motion falls well short of making that showing. Instead, as demonstrated below, the United States' investigative team has proactively worked in good faith throughout this investigation, including during the execution of the lawful warrant and thereafter concerning any seized materials.

Burke also requested oral argument on his motion. Doc. 26. The United States does not object to his request for oral argument but does not believe that oral argument would be useful, given that the issues presented have been fully briefed and that, at this early juncture, the United States' compelling interest in protecting and safeguarding the integrity of its ongoing criminal investigation curtails the areas available for appropriate inquiry.

## I.   BACKGROUND

### A. The Search and Seizures

On May 4, 2023, this Court found probable cause supported the United States' application for a warrant to search the Burke address for records and evidence relating to violations of 18 U.S.C. § 1030 (intentional unauthorized access of a computer), and 18 U.S.C. § 2511 (intentional interception and disclosure of wire, oral, or electronic communication), and issued the pertinent warrant. Doc.

2

18-1 at 1-19.[1] The application for that warrant specified the bases for the search as seeking: (1) evidence of a crime; (2) contraband, fruits of a crime, or other items illegally possessed; and (3) property designed for use, intended for use, or used in committing a crime. *Id.* at 13. On consideration of a motion filed by the United States and in the interests of justice, this Court sealed the warrant application, the warrant, the PC Affidavit, and other associated records. *Id.* at 20-24.

Prior to executing the warrant at the Burke address, a member of the FBI search team was designated to act as a filter-team agent in case the agents encountered potentially privileged materials, and an AUSA who was not part of the investigative team was identified to coordinate with that designated agent if needed. Additional protocols were developed concerning how the agents were to handle any material(s) that appeared to be pre-publication items containing work product materials or other documentary materials.

FBI agents executed the warrant at the Burke address on May 8, 2023. Doc. 1. In the secondary suite behind the primary residence, the agents located a workspace that contained hundreds of items that qualified as either a computer or storage medium,[2] as described in Attachment B to the warrant. The search team

---

[1] The underlying search warrant records were originally filed in the case styled *In the Matter of the Search of Premises Located at 5914 N. Tampa Street, Tampa, FL 33604*, No. 8:23-mj-1541-SPF.

[2] In accordance with Attachment B, paragraph 5, of the warrant, the term "COMPUTER" collectively referred to any computer or storage medium whose seizure was otherwise authorized by the warrant, and any computer or storage medium that contained or in which was stored records or information that were otherwise called for by the warrant.

3

left with approximately two dozen electronic devices and two hard copy items,[3] which are particularized in the Evidence Collected Item Log ("Evidence Log"), filed with this Court as part of the warrant return. Doc. 18-1 at 28-29.

B. The Times Publishing Company Proceedings

The Times moved to intervene in the proceedings and requested that this Court unseal all Court records related to the search at the Burke address, including the PC Affidavit. Doc. 1. The United States did not object to The Times's request to intervene in the matter and, except for some agreed-upon narrowly tailored redactions to certain search warrant records, the United States did not object to The Times's request to unseal five (of six) search warrant records. Doc. 17. This Court granted, in part, The Times's motion to intervene and unsealed the five court records (with redactions agreed to by the parties). Docs. 18, 18-1.

But the United States **did oppose** The Times's motion to unseal the PC Affidavit. The United States explained that PC Affidavit must remain sealed—to protect and safeguard the integrity of the ongoing federal criminal investigation, the safety and security of law enforcement personnel, and the privacy of others—and offered substantial legal authority supporting that position.[4] Doc. 17 at 5-9. The

---

[3] Whereas the electronic items represent only a small fraction of the total electronic devices in Burke's workspace, the associated information contained in those 21 items equals approximately 80 terabytes. Each item identified in the Evidence Log is identified here by its Item #__ (e.g., Item #1).

[4] *See United States v. Valenti,* 987 F.2d 708, 712-714 (11th Cir. 1993) (ongoing law enforcement investigation is a compelling government interest justifying denial of newspaper's access to transcripts of closed proceedings); *and see, e.g., In re: Search of WellCare Health Plans Inc.*, Case No.

United States also noted that, in addressing a pre-indictment challenge to grand jury proceedings, the Eleventh Circuit has specifically recognized the importance of maintaining secrecy during a federal criminal investigation.[5] *Id.* The United States also offered additional negative consequences that could result from unsealing the PC Affidavit at this early stage, including that it could: (1) unintentionally pollute the investigation by corroding the quality of recollections maintained by potential witnesses and victims with non-public information contained in the affidavit; and (2) have devastating consequences for persons who have been cleared of any misconduct, as well as those still under investigation.[6] *Id.* Finally, the United States explained that the conduct set forth in the PC Affidavit reveals an investigation that may, if properly safeguarded,

---

8:07-mj-01466-TGW, Doc. 7 (referencing *Valenti* and noting that the Eleventh Circuit has recognized prejudice to an ongoing investigation as compelling reason for closure); *In re Search of Office Suites For World & Islam Studies,* 925 F. Supp. 738, 741-743 (M.D. Fla. 1996) (the United States' reasons for sealing the search-warrant affidavit are compelling and far outweigh press's right of access where affidavit contains identifications of subjects, scope and direction of investigation, and references to witnesses); *Douglas Oil Co. v. United States*, 441 U.S. 211, 219 (1978) (premature disclosure of investigative information creates a risk that "persons who are accused but exonerated" may be "held up to public ridicule"); *see also, e.g., United States v. Steinger*, 626 F.Supp.2d 1231, 1235 (2009) (disclosure of names of subjects and of matters being investigated "could have devastating consequences for those persons who have been cleared of any misconduct, as well as for those still under investigation").

[5] *See Blalock v. United States*, 844 F.2d 1546, 1550 n.5 (11th Cir. 1988) ("The courts' concern for grand jury secrecy and for the grand jury's law enforcement function is generally greatest during the investigative phase of grand jury proceedings." Disclosure during investigation, "may frustrate the investigation by allowing the persons under investigation to escape, to suborn perjury, or to bribe or intimidate potential witnesses or members of the grand jury. Premature disclosure may also damage the reputations of persons the grand jury's final investigation may exonerate.").

[6] Protecting the identities of the uncharged is also consistent with government counsel's professional responsibilities. *See* Justice Manual § 9-27.760 ("Limitation on Identifying Uncharged Third-Parties Publicly").

extend well beyond the specific facts and events described therein. *Id*.

This Court, after weighing the parties' arguments and examining the PC Affidavit *in camera*, denied that aspect of The Times's motion, reasoning in part:

> Almost every paragraph of the affidavit, either explicitly or implicitly, reveals details of the investigation, including how and when the alleged incident(s) occurred, the private information intruded upon, the techniques the agent employed to investigate the intrusions, and/or who was carrying out the cyber intrusions and why. Put differently, each section of the affidavit builds on the one before it, and the sum of these parts equals the Government's probable cause. If disclosed – even in redacted form – there is the real and legitimate risk that the Government's ongoing investigation would be compromised by someone piecing together the timeline, scope, and direction of the investigation. …. Even information in the affidavit that is already publicized is "inextricably intertwined with the Government's argument for probable cause" and cannot be unsealed. Sealing the entire affidavit is necessary to protect the integrity of the United States' investigation.

Doc. 23 at 3-4 (internal citation omitted).

## C. The United States' Continuing Efforts to Coordinate with Burke's <u>Counsel Regarding the Processing and Return of Seized Material</u>

The undersigned spoke with Burke's counsel on May 8, 2023, and arranged to meet with counsel the next day. From that conversation onward, the United States has repeatedly expressed its good-faith desire to avoid unintentionally accessing any potentially privileged or protected communications or materials associated with Burke or his spouse and to coordinate the return of any necessary work product materials. Consistent with that position, the undersigned wrote to Burke's counsel on June 2nd and explained:

> that it was not our intention to seize and maintain any potentially privileged communications (such as, attorney-client communications or spousal communications) concerning Mr. Burke or [his spouse], any materials

relating to [his spouse's] political work as a City Council member, or any of Mr. Burke's work product or documentary materials, other than those items specified in the pertinent warrant. In that regard, we affirmatively invited you (and [Burke's spouse's] counsel) to provide any information you deemed appropriate to assist in that process.  … " As of this date, we have not received any specific information or input concerning any of the above—potentially privileged communications, political information or work product, or Mr. Burke's work product or documentary materials— from anyone associated with Mr. Burke or [his spouse], other than general statements that they would like their property returned as soon as possible (which is particularly challenging here given the volume of data that must be processed). … That said, to the extent you do have information or input you would like to provide to either expedite the process or ensure that Mr. Burke has access to any necessary work product materials, we will continue to make ourselves available.[7]

 The United States also coordinated with Burke's counsel in attempts to assist Burke in gaining access to his Twitter account. But those efforts were temporarily unsuccessful because Burke had combined his Twitter credentials (password and authentication information) on his mobile phone, which had been seized on May 8th in accordance with the warrant, Attachment B, paragraph 4. To expedite the phone's processing (forensic imaging and review), the United States explained to counsel that, because the phone was password protected, the United States would be "better positioned to expedite the review of the device if [the United States could] secure the password." Burke's counsel replied that he would, "find out what he [could] about [Burke's] devices." Ultimately, counsel declined to voluntarily provide the password to Burke's phone and insisted that the phone be returned.[8]

---

[7] The United States will provide to the Court complete copies of any correspondence desired.

[8] As acknowledged in Burke's Motion, Doc. 25 at n.6, the United States did not (and has not) conditioned the return of Burke's phone upon his waiver of his rights under the Fifth Amendment.

On June 22nd, the undersigned again wrote to Burke's counsel and offered dates and time windows during which the undersigned was available to speak about the processing and return of materials to Burke. In that communication, the undersigned explained, in part:

> … I am not presently amenable to discussing the ongoing investigation and your client's role in the conduct under investigation. That should not be construed, however, as me agreeing with your assessment of the facts. …
>
> Further, it was my understanding based upon our conversations that, to the extent you [ ] felt the government had seized items that did not fall within Attachment B of the warrant, we were going to work collaboratively to resolve the issue(s). In that regard, you were going to review the inventory of seized items with your client and then contact me if you felt that was the case. I also explained during our previous conversation and in the attached email (dated June 6, 2023) that, to expedite the review of Mr. Burke's phone, we would need the password, which I understood you were going to discuss with him.
>
> In any event, if you [ ] and/or Mr. Burke needs to retrieve some information from Mr. Burke's phone to facilitate his ability to access and use his Twitter account (or to access some other account), the investigative team will make itself available to meet at the FBI and explore whether it is possible to facilitate that process without compromising the original evidence.
>
> Finally, I have also attached my email dated June 2, 2023. My communications and offers in that email remain.

Again, the defense declined to provide any actionable information in response to the United States' entreaties that could preemptively facilitate the protection of potentially privileged or protected communications or materials associated with Burke or his spouse and the return of any claimed work-product materials.

Still, the United States and Burke's counsel continued to discuss the return of materials to Burke. That discussion focused, in part, on how the United States

could copy and produce processed electronic materials while still preserving Burke's ability to use those materials during future legal proceedings. In a proactive effort to reach an agreement, the United States, on July 14th, sent an email to counsel and attached "a proposed stipulation addressing issues related to the copying and/or return of items seized (and parts of items seized) during the execution of the court-authorized search warrant at [Burke's address]." The United States further noted: "[T]o the extent you deem appropriate[,] please inquire of [Burke] whether there are any potential attorney-client communications in the materials so that we can ensure that we continue to avoid them."

On July 17th, Burke's counsel submitted a letter to the United States, stating that Burke had declined to provide his password to facilitate the United States' access to his phone for processing. Pursuant to follow-up discussions concerning the processing and return of materials, counsel also delivered seven hard drives to the United States. On the 20th, the United States informed counsel that the FBI had managed to gain access to and secure a forensic copy of Burke's phone (circumventing the need for a password) and that the FBI agents would make themselves available to Burke and counsel at the FBI Tampa office so that Burke could log on to his phone and address any issues with his Twitter account.

The next morning, July 21st, in yet another effort to avoid unnecessary motion practice, the United States—the undersigned and supervisor(s)—expressly offered to meet with Burke's counsel to discuss any outstanding issues, including concerns about the United States' process to protect potentially privileged

9

information and the United States' proposed stipulation concerning the copying and production to Burke of seized materials. That offer was made via an email that included language that further refined the United States' proposed stipulation. A copy of that proposed stipulation and refining email is attached as Attachment A. Around 1:30 pm, Burke and his counsel appeared at the FBI office where Burke was provided temporary possession of his phone to restore access to his Twitter account, after which the phone was returned to law enforcement for review and processing per the warrant. Thereafter, Burke's counsel notified the undersigned that counsel declined to meet with the United States and filed Burke's Motion. Burke's counsel *has still not responded* to the United States' proposed stipulation.

Regardless, per the United States' (refined) proposed stipulation, the United States recognizes its obligation to return to Burke any item seized determined to contain only information falling outside the authority to seize under Attachment B to the warrant, and to eliminate any image of that item in its systems. As to items that contain a mix of information falling inside and outside the authority to seize under Attachment B, the United States intends to produce to Burke copies of all folders and files contained in the items, withholding only those files that fall within the authority to seize that constitute contraband or fruits of the identified crimes. The United States is first segregating the folders/files that predate midnight, August 22, 2022,[9] and downloading copies of those folders/files onto the drives

---

[9] While the search warrant permitted the United States to seize material relating to the specified violations after August 1, 2022, the investigative team has determined that it can return originals or

provided by Burke (without review by the United States other than for production purposes). Folders/files dated midnight or after that date will be subjected to an internal filter review, after which approved unprotected folders/files will be made available to the investigative team for its review and continued production to Burke of folders/files that do not constitute contraband or fruits of the identified crimes.

To that end, on July 27th, the undersigned notified Burke's counsel that the initial return of property had been loaded onto one of the drives provided and was available for retrieval. That return involved the production to Burke of three websites: burke-communications.com, mocksession.com, and a website associated with Burke's spouse. As of today, the United States has made available for return to Burke original Item #19 and has produced copies of folders and files contained on Items #7 (partial return), #14, #17 (partial return), #20 (partial return), #21, #22, #23, and #24 (partial return) that predate midnight, August 22, 2022.

## II.    THE MOTION TO UNSEAL AND FOR RETURN OF PROPERTY

### A. Generally

Burke's Motion is primarily premised on Burke's counsels' erroneous speculation about underlying case facts, circumstances, applicable law, the focus of the United States' ongoing criminal investigation, and the United States' underlying legal theories.[10] Burke's motion also repeats throughout that Burke is a

---

copies of all folders and files that predate midnight, August 22, 2022.

[10] As explained above at page 8, and noted in Burke's Motion, Doc. 25 at 12 and 18, the United States has declined at this stage to engage in discussions concerning the ongoing investigation.

"journalist" who "finds things" on the internet. *See, e.g.*, Doc. 25 at 6 and 8. As specific examples of Burke's working in this capacity, the motion notes that Burke was nominated for awards for his work exposing a catfishing hoax in 2013 against football player Manti Teo and for a video Burke created in 2018 about Sinclair Broadcast Group.[11] That information is consistent with Burke's resume, published by him on his ilovecitr.us website, which states that Burke previously worked for the Gizmodo Media Group and The Daily Beast from 2011 through 2019.

Although Burke at one time may have been a professional journalist, the United States has been unable to find any evidence that Burke has regularly published under his own byline after January 1, 2021, as a salaried employee of, or independent contractor for, any newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine.[12] Moreover, Burke has for some years primarily categorized his work as that of a consultant. On his burke-communications.com website, Burke describes his work as concerning "Social/Political/Media Consulting;" and on his ilovecitr.us website, Burke states that he is a "media + political communications consultant, broadcast monitor, archival technologist, and viral content visionary." Attachment B. Regardless of how Burke categorizes his work (as a "journalist" or a "consultant"), Burke is not immune from investigation and prosecution if, as part

---

[11] The motion also includes that Burke was featured in a 2022 Netflix documentary about his 2013 work concerning Teo, and refers to publication(s) of additional video. *Id.* at 6-8.

[12] *See* Florida Statute 90.5015(1)(a), Florida journalist privilege, defining "professional journalist."

of that work, he "finds things" through criminal acts, such as unlawfully accessing a computer or computer system (in violation of 18 U.S.C. § 1030) and/or by unlawful surveillance or wiretapping (in violation of 18 U.S.C. § 2511).

B.  Department of Justice Policies

Burke's Motion includes multiple *unsupported and baseless suggestions of wrongdoing* by the United States' investigative team regarding the Department of Justice's (the "Department's") policy concerning the need to secure prior authorization for search warrants that may implicate the Privacy Protection Act ("PPA"),[13] and the Department's *Policy Regarding Obtaining Information from or Records of Members of the News Media; and Regarding Questioning, Arresting, or Charging Members of the News Media* (the "News Media Policy").[14, 15] Here, the government has fully complied with all aspects of its own PPA policy and its News Media Policy during the ongoing investigation.

The PPA generally prohibits the search for and seizure of "work product materials" or other "documentary materials"[16] that are "possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper,

---

[13] 42 U.S.C. § 2000aa, *et seq.*

[14] 28 CFR 50.10(i)(1) (revised, November 3, 2022). Attachment C.

[15] Burke's counsels' repeated use of the terms "journalist" and "newsroom" to describe Burke and his workspace, respectively, suggests a misguided strategy deployed to tilt Department policies and other authorities in his favor. Indeed, the facts and arguments raised in the motion and attached letter read as if they were crafted working backwards from Department policies to fabricate suggested wrongdoing by the United States and additional (nonexistent) protections for Burke.

[16] *See* 42 U.S.C. § 2000aa-7(b) and 2000aa-7(a), respectively.

book, broadcast, or other similar form of public communication." 42 U.S.C.
§ 2000aa(a) and (b). The PPA protects against "government searches for
documents and materials that are intended for publication." *See Sennett v. United
States*, 667 F.3d 531, 535 (4th Cir. 2012) (emphasis omitted). But, even where an
individual intends to disseminate information to the public, the PPA does not
prohibit the government from using a search warrant when: (1) the information
sought, even if intended for publication, consists of materials that are contraband,
fruits of a crime, items criminally possessed, or instrumentalities of a crime;[17] or (2)
there is probable cause to believe the "person possessing the [PPA] materials has
committed or is committing the criminal offense to which the materials relate."[18]

As to the News Media Policy, the Department has promulgated internal
regulations relating to obtaining information from or records of members of the
news media and questioning, arresting, or charging members of the news media.[19]
*See* Attachment C. These regulations impose some internal limitations on
investigative techniques that may be used to obtain information from or records of
members of the news media and set forth internal Department approval

---

[17] *See* 42 U.S.C. § 2000aa-7.

[18] *See* 42 U.S.C. § 2000aa(a)(1) and (b)(1), commonly referred to as the "suspect exception."

[19] The Attorney General issued revised News Media Policy regulations on October 26, 2022. The specific changes to the regulations are not relevant here because neither version creates any enforceable rights for any defendant or members of the news media. Unless otherwise noted, citations to the regulations refer to the current version of the rule.

requirements before law enforcement may employ various investigative techniques in relation to members of the news media.

Even if the government had not complied with its policies (*which is not the case here*), those policies do not create any substantive or procedural right or benefit, much less a right enforceable at this early stage of an investigation through Burke's instant motion. The News Media Policy is explicit that it "is not intended to, and *does not, create any right or benefit, substantive or procedural, enforceable at law or equity by any party against the United States*, its departments, agencies, or entities, its officers, employees, or agents, or any other person."[20] 28 C.F.R. § 50.10(t) (emphasis added). Moreover, the policy is clear from its opening paragraph that it "is not intended to shield from accountability members of the news media who are subjects or targets of a criminal investigation for conduct outside the scope of newsgathering." 28 C.F.R. § 50.10(a)(1). The policy specifically defines "newsgathering" to exclude from its scope criminal acts committed in the course of obtaining or using information, such as unlawfully accessing a computer or a computer system, and unlawful surveillance or wiretapping. 28 C.F.R. § 50.10(b)(2)(ii)(B). Burke's counsel have cited no law, statutory or otherwise, that required the Department to establish internal rules and

---

[20] The Fourth Circuit has explained that the Department's news media policy "is of the kind to be enforced internally by a governmental department, and not by courts through exclusion of evidence." *In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992). Regardless, any internal administrative disciplinary action (not warranted here) is not available as a remedy for a subject seeking to upend an ongoing federal criminal investigation.

regulations relating to investigations of members of the news media. There is none.[21]

Further, Burke's complaint that the seizure of property identified in a search warrant has imposed burdens upon him and others is not extraordinary, or even unusual, in an ongoing federal criminal investigation, even in the context presented by Burke. As the Supreme Court stated: "It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. … [O]therwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed." *Branzburg v. Hayes*, 408 U.S. 665, 682–83 (1972). This principle is particularly applicable here, where any potential burden stems from an ongoing criminal investigation in which Burke is a subject and this Court has found probable cause supported the United States' application for the relevant warrant. Indeed, the Supreme Court has recognized that it would be "frivolous" to assert—much less hold—that a reporter or his sources would have a "license . . . to violate valid criminal laws." *Id.* at 691.

## III.   ARGUMENT

### A.   Burke's Request to Unseal the PC Affidavit Should be Denied.

Burke's request that this Court unseal the PC Affidavit at this early stage is

---

[21] *See, e.g., In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1153 (D.C. Cir. 2006) (Department's news media guidelines were "not required by any constitutional or statutory provision" and "provide no enforceable rights to any individuals"); *In re Special Proceedings*, 373 F.3d 37, 44 n. 3 (1st Cir. 2004) (news media guidelines do not create legally enforceable rights).

meritless. This Court has already found that probable cause supported the United States' application for a warrant to search the Burke address and to seize the items described in Attachment B to that warrant. As explained above, courts have consistently opined that unsealing a search-warrant affidavit or otherwise making public details of an ongoing criminal investigation at this stage could undermine the United States' compelling interest in protecting and safeguarding the integrity of its investigation, the safety and security of law enforcement personnel, the privacy of unnamed and uncharged subjects of the investigation, and the privacy of third-party fact witnesses and potential victims.[22] *See, e.g.*, *In re: Search of WellCare Health Plans Inc.*, Doc. 7 (referencing *Valenti* and noting that the Eleventh Circuit has recognized prejudice to an ongoing investigation as compelling reason for closure); *In re Search of Office Suites For World & Islam Studies,* 925 F. Supp. at 741-43 (United States' reasons for sealing the search-warrant affidavit are compelling and far outweigh press's right of access where affidavit contains identifications of subjects, scope and direction of investigation, and references to witnesses).[23] In denying The Times's motion, this Court has already determined that "[s]ealing the entire affidavit is necessary to protect the integrity of the United States'

---

[22] Indeed, some of these concerns are heightened in an investigation concerning allegations against one or more subject(s) involved in computer-intrusion-related conduct.

[23] Moreover, unsealing the PC Affidavit now could also corrode the quality and recollection of potential witnesses and victims, and impose significant negative consequences on those who have or may be cleared of any misconduct. *See, e.g., Douglas Oil Co.,* 441 U.S. at 219; *Steinger*, 626 F.Supp.2d at 1235.

investigation." Doc. 23 at 4. The United States incorporates the arguments and authority from its response opposing The Times's motion. Doc. 17.

Although he acknowledges the lack of any supporting Eleventh Circuit authority, Doc. 25 at n.29, Burke nonetheless seeks to unseal the PC Affidavit—when only probable cause is at issue (and has been previously found)—in an effort to launch a fishing expedition into the United States' ongoing investigation. Burke's counsel is unabashed in attempting to review and challenge: (1) the United States' internal "legal considerations" and determinations regarding Department policies during the ongoing investigation; (2) the evidence secured against the subject(s); and (3) the United States working legal theories. Doc. 25 at 12-15, 18-19. Grasping to include some authority, the motion bootstraps *Franks v. Delaware*, 438 U.S. 154, 156, 165-71 (1978).[24] But *Franks* is unanalogous because it concerned a review of a probable cause affidavit *after* charges had been initiated against the defendant. That is not the case here: this matter concerns an ongoing investigation in the early stages where no charges have been brought against any defendant.

Finally, and again without any Eleventh Circuit support, Burke's motion argues that Burke, as a subject of an investigation, has a higher interest than The Times in disclosure of the PC Affidavit because Burke desires to (prematurely)

---

[24] Burke also cites to a discovery order from an extradition matter in the Northern District of California. Doc. 25 at 15 (citing *In re Extradition of Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 12-13 (N.D. Cal. Feb. 6, 2020)). And while Burke cherry picks language from that order, he neglects to mention that in that case, the magistrate judge ordered the redaction to prevent the disclosure of sensitive information. *Id*. at 13. But this Court has already determined that it is impossible to excise the sensitive information from the affidavit here through redactions.

challenge the search and seizures, and would be better positioned to do so if he could leverage this Court's authority to (improperly) pierce the United States' ongoing investigation and discover details about that investigation's progress, methods, techniques, focus, and theories. His motion includes an extended argument, Doc. 25 at 15-20, in which he (also prematurely) argues that probable cause could not properly have been found because, as Burke sees it—based upon attorney-proffered assertions of selected facts and assumed government theories—there was no violation of law. But Burke is not situated any differently than any other subject in an ongoing federal criminal investigation whose property has been searched for evidence of criminal conduct after the issuance of a warrant by a magistrate judge. There may come a time—e.g., following the filing of a complaint or indictment against Burke—when he is properly situated to challenge the PC Affidavit, but that time is not at this early stage of an ongoing complex criminal investigation. To the extent Burke is requesting that this Court enter an order unsealing any aspect of the PC Affidavit, that request should be rejected.

      B.    This Court Lacks Jurisdiction to Entertain Burke's Request for Return of Property and Should Dismiss it.

Burke, pursuant to Fed. R. Crim. P. 41(g), is attempting to use this Court's jurisdiction to block the United States from using lawfully seized records in a criminal investigation. Burke argues that "even if the initial seizure were lawful, this Court has the equitable power to order the materials to be returned where, as here, the continued retention of these documents is unlawful." Doc. 25 at 9. This

Court, however, lacks jurisdiction to order the United States to return Burke's property during its criminal investigation under the circumstances presented.

This Court has no general equitable authority to superintend federal criminal investigations. The basis of this Court's jurisdiction to order pre-indictment return of property is grounded in the Court's supervisory power over its officers and is equitable in nature. *See Hunsucker v. Phinney*, 497 F.2d 29, 34 (5th Cir. 1974). This Court's exercises of equitable jurisdiction "should be exceptional and anomalous." *Trump v. United States.*, 54 F.4th 689, 694 (11th Cir. 2022) (internal quotation marks omitted). Significantly, the burden of establishing jurisdiction rests on Burke—and "[o]nly the narrowest of circumstances permit a district court to invoke equitable jurisdiction." *Id*. at 697. Indeed, "[s]uch decisions must be exercised with caution and restraint, as equitable jurisdiction is appropriate only in exceptional cases where equity demands intervention." *Id*. (internal quotations and citations omitted).

Thus, to avoid "unnecessary interference with the executive branch's criminal enforcement authority" while maintaining the possibility of "relief in rare instances where a gross constitutional violation would otherwise leave [a] subject of a search without recourse[,]" courts should limit this jurisdiction using the four-factor test delineated in *Richey v. Smith*, 515 F.2d 1239, 1243–44 (5th Cir. 1975):

> (1) whether the government displayed a "callous disregard" for the plaintiff's constitutional rights; (2) "whether the plaintiff has an individual interest in and need for the material whose return he seeks"; (3) "whether the plaintiff would be irreparably injured by denial of the return of the property"; and (4) "whether the plaintiff has an adequate

remedy at law for the redress of his grievance."

*Id.*

But the four factors are not to be weighed equally. Instead, Burke must first establish through an "accurate allegation" the government's "callous disregard for his constitutional rights" before this Court intervenes in the United States' ongoing investigation. *Trump*, 54 F.4th at 698. "Otherwise, a flood of disruptive civil litigation would surely follow. This restraint guards against needless judicial intrusion into the course of criminal investigations—a sphere of power committed to the executive branch." *Id.* (internal quotation and citation omitted).

Burke has not met (cannot meet) the callous-disregard standard. First, Burke's prior-restraint argument fails. He has not identified any material seized by the United States which he intended to publish imminently, and therefore it is unclear how the seizure constitutes a prior restraint. Second, the United States is producing originals or copies of all folders/files that are not contraband or fruits of identified crimes so that Burke can have access to the material. It does not constitute a prior restraint for the United States to retain the materials that a magistrate judge found probable cause to believe Burke illegally obtained. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 567 (1978) ("[P]resumptively protected materials are not necessarily immune from seizure under warrant for use at a criminal trial. Not every such seizure, and not even most, will impose a prior restraint.").

In *Zurcher*, the Supreme Court also rejected the argument raised by Burke here that a warranted search will have a chilling effect on sources. *See id.* at 566.

("Nor are we convinced, any more than we were in [*Branzburg*] that confidential sources will disappear and that the press will suppress news because of fears of warranted searches."). And the Supreme Court also found it unpersuasive that such searches of journalist are rare: "The fact is that respondents and amici have pointed to only a very few instances in the entire United States since 1971 involving the issuance of warrants for searching newspaper premises. This reality hardly suggests abuse. … [T]he press is not only an important, critical, and valuable asset to society, but it is not easily intimidated—nor should it be." *Id.*

Simply put, in *Zurcher*, the Supreme Court held, "Properly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness—should afford sufficient protection against the harms that are assertedly threatened by warrants for searching newspaper offices." *Id.* at 565. And *Zurcher* concerned a search of a student newspaper, the Stanford Daily, that had created work product—articles and photographs—*in reporting on a demonstration* that had erupted into violence *but in no way involved any allegation of unlawful acts* by Stanford Daily staff members.[25]

Moreover, Burke has premised his argument in this regard upon his erroneous suspicion that the investigative team has failed to comply with various internal Department policies and that the lawful warrant executed at his address resulted in

---

[25] Congress passed the PPA in response to *Zurcher*. And, although the PPA prohibits the search and seizures of materials intended for public dissemination, the statute has no effect on the constitutional analysis in *Zurcher*.

the seizure by the government of certain work-related materials. That argument could be raised by any subject of a lawful search warrant who was even tangentially involved in media. And mere failure to follow its own policies does not rise to a level of a callous disregard of a constitutional right.

And in any event, the United States has diligently followed its policies and procedures to safeguard Burke's First Amendment rights. As explained above, the United States has made proactive and repeated good-faith efforts to prevent the investigative team from unintentionally encountering any potentially privileged or protected communications or materials. In that regard, a search-team agent was designated prior to the search to act as a filter-team agent if any potentially privileged or protected materials were encountered at the Burke address, and additional protocols were developed prior to the search concerning how the agents were to handle any materials that appeared to potentially be pre-publication items containing work-product or other documentary materials. Once the search had been completed, the undersigned repeatedly encouraged Burke's counsel to provide any guidance they felt appropriate to facilitate the protection and/or segregation of any seized materials or communications. Until recently, July 17th—when counsel provided more specific information about Burke's potential attorney-client communications and additional work-related information—counsel had declined to provide any specific actionable information, instead only repeating overbroad and unhelpful assertions.

The undersigned also proactively provided to Burke's counsel a proposed stipulation addressing issues related to the copying and/or return of materials seized

during the execution of the search warrant, which counsel has ignored. And, the undersigned (and supervisors) offered to meet with counsel to discuss any issues or concerns about the United States' process to protect potentially privileged or protected information. Again, that offer was declined. Moreover, the United States has assisted Burke in reestablishing his social media account and is working to return to Burke either original or copies of seized materials. Indeed, the only electronic files seized during the execution of the warrant that will not be returned are files that constitute contraband or fruits of violations of 18 U.S.C. §§ 1030 and/or 2511, involving Burke and dated on or after midnight, August 22, 2022, in accordance with this Court's authorization under Attachment B to the warrant.

Finally, there is no merit to Burke's argument that the United States acted in callous disregard of his Fourth Amendment rights by unlawfully seizing his property. The United States obtained a search warrant from this Court which it supported with a probable cause affidavit. While Burke speculates about the United States' theory of the case and argues that he did not commit a crime, this Court has already found that the United States had probable cause to seize the property. This is not the juncture to litigate the ultimate merits of his case. Because Burke has failed to establish his general allegation of "callous disregard," this Court need not entertain the other *Richey* factors, *Trump*, 54 F.4th at 698, and the Court lacks jurisdiction to intervene in the ongoing investigation as Burke requests. That said, the other factors weigh in United States' favor. The second *Richey* factor—whether Burke has an individual interest in and need for the material he

seeks—is a non-issue. As discussed above, the United States is producing to Burke originals or copies of all folders/files not considered contraband or fruits. The third factor—whether Burke will be irreparably injured by denial of return of the property—also favors the United States. Since the United States is producing to Burke originals or copies of all folders/files that are not contraband or fruits of crime, Burke cannot identify any irreparable injury that would not also apply to nearly every subject of a like search warrant. *See, e.g., id.* at 700. The fourth factor—whether Burke has an adequate remedy at law for the redress of his grievance—also falls in favor of the United States. As in *Trump*, the only argument available to Burke is that files retained by the United States as contraband are not within the scope of the warrant. *See, e.g., id*. There is no record evidence that the United States exceeded the scope of the warrant authorized by this Court after the finding of probable cause and ample evidence demonstrating that the United States is making good-faith efforts to return originals and copies of all folders/files not considered contraband. And again, as in *Trump*, "[Burke's] argument would apply universally; presumably any subject of a search warrant would like all of his property back before the government has a chance to use it." *Id.*

## IV.    CONCLUSION

WHEREFORE, this Court should deny Burke's Motion to unseal the PC Affidavit, and should dismiss his Motion for Return of Property for lack of jurisdiction.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney


By:   */s/ Jay G. Trezevant*
      Jay G. Trezevant
      Assistant United States Attorney
      Florida Bar No. 0802093
      400 N. Tampa Street, Suite 3200
      Tampa, Florida 33602-4798
      Telephone:   (813) 274-6000
      Facsimile:    (813) 274-6358
      E-mail: jay.trezevant@usdoj.gov

**Times Publishing Company v. U.S.**          **Case No. 8:23-mc-00014-WFJ-SPF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Michael Maddux, Esq.

Mark Rasch, Esq.

Jon M. Philipson, Esq.

<u>/s/ Jay G. Trezevant</u>
Jay G. Trezevant
Assistant United States Attorney