**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**TIMOTHY BURKE**

v.  CASE NO.  8:23-mc-00014-WFJ-SPF
 8:23-mj-1541-SPF

**UNITED STATES OF AMERICA**
_____/

**MR. BURKE'S RESPONSE TO**
**GOVERNMENT'S STATUS REPORT**
**ON RETURN OF COPIES OF ITEMS SEIZED**

On November 24, 2023, the government filed with this Court a fourth status report concerning the contents of documents and records, seized pursuant to a search warrant on May 9, 2023, which have been returned to Mr. Burke or to his wife, Tampa City Council Member Lynn Hurtak. (Dkt. No. 49). Mr. Burke, through counsel, submits this response, clarifying some of the issues related to the government's piecemeal return of data and hardware. Our estimate is that, as of today, approximately 84.5 TB of storage was seized, of which 4 TB has been returned in physical form, and 37 TB has been returned in copied form, adding up to 49% of the seized storage having been returned. The bulk of the materials returned are "old" materials - that

is, materials that are not within the temporal time period covered by the affidavit in support of the warrant.

### 1.  Materials "Covered by" The Warrant

The warrant in this case ordered law enforcement agents to seize and examine evidence of violations of Title 18 USC 1030 and Title 18 2511 created after August 22, 2022, and a supplemental warrant extended the applicable date for which the government was authorized to seize/examine records of these two offenses to February 20, 2022.  As a result, while the government was authorized to seize certain computers or other ESI - it was only permitted to do so to the extent that these devices actually contained documents and records which were BOTH created after the date specified in the warrant AND which related to violations of these two statutes.  Thus, the warrant affidavit, the finding of probable cause, and the specificity of the warrant had both a temporal (time) and subject matter (crime) component. Any file or record which does not meet both components is outside the scope of the warrant, and may only be seized to the extent necessary to preserve the integrity of some item within the scope of the warrant, and importantly may only be examined (either by a human or an electronic program) to determine whether it meets both components of the warrant.

Every other file, document, records, email, tweet, social media posting, photograph, stored media, etc., which does not meet both requirements is "outside the scope of the warrant" and was either improperly seized, or if seized properly, may not be examined by the government except a cursory inspection to make sure that the file is outside the scope of the warrant both temporarily and by subject matter. All of those records should be returned to Mr. Burke --- and indeed should never have been taken from him.

### 2. Request for Inventory of Items Retained

To date, <u>the bulk of the information returned is outside the temporal parameters of the warrant.</u> For example, the government notes (Document 49, p. 1) that they have returned to Mr. Burke "copies of the folders/files" on certain listed items "except those 'Particular Things to be Seized….'" Thus, the government *appears to be indicating* that the ONLY documents it currently retains are those listed in Attachment B to the warrant - evidence of violations of 18 USC 1030 and 2511 which were created between February 20, 2022 (the date of the modified warrant) and May 9, 2023 (the date of the warrant execution). However, we have no *inventory* of which files or folders on those drives the government has NOT returned, nor could we know (without having access to either the original drive or a forensic copy) what

these files are, or how voluminous these files might be. This is significant because Mr. Burke had on his terabytes of stored live streams obtained from various sources from which he intended (and continues to intend) to generate news reports -- including reports critical to the national interest. As far as we are aware, these live streams themselves are not evidence of any crime. However, the government has, in the past, indicated that they do not intend to return any of these live streams under the theory not that they are evidentiary *per se*, but that they might be some sort of "contraband." Therefore, in the interest of clarity, and to narrow any controversy concerning the review of the records, Mr. Burke requests that the government provide to the Court an inventory of the files or folders that it has retained and not returned, together with a description of the approximate size of such files. [1]

3. **Privilege Log/Filter Team Report**

The bulk of the items seized from Mr. Burke, including the content of data collected for dissemination to the public, Mr. Burke's communications

---

[1] F.R.Crim.P. 41(f)(1)(B) provides that, when electronic evidence is seized, "the inventory may be limited to describing the physical storage media that were seized or copied." However, because Mr. Burke continues to contend that the materials seized were both protected under law and relate to both core political speech and the right to publish -- both First Amendment protected activities -- a more specific inventory will assist the Court in determining the adequacy of the government's minimization efforts.

with both sources and other journalists, his confidential methods of data collection, and even the nature of stories he was working on and his editorial process for determining what to look for and where, as well as the identity of his clients (those who retained his journalistic services) are, in our opinion, not only protected under the Florida journalist shield law[2], but are protected

---

[2] **(1) Definitions.--**For purposes of this section, the term:
(a) "News" means information of public concern relating to local, statewide, national, or worldwide issues or events.
(b) "Professional journalist" means a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine. Book authors and others who are not professional journalists, as defined in this paragraph, are not included in the provisions of this section.
**(2) Privilege.--** A professional journalist has a qualified privilege not to be a witness concerning, and not to disclose the information, including the identity of any source, that the professional journalist has obtained while actively gathering news. This privilege applies only to information or eyewitness observations obtained within the normal scope of employment and does not apply to physical evidence, eyewitness observations, or visual or audio recording of crimes. A party seeking to overcome this privilege must make a clear and specific showing that:
(a) The information is relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought;
(b) The information cannot be obtained from alternative sources; and
(c) A compelling interest exists for requiring disclosure of the information.
**(3) Disclosure.--** A court shall order disclosure pursuant to subsection (2) only of that portion of the information for which the showing under subsection (2) has been made and shall support such order with clear and specific findings made after a hearing.
**(4) Waiver.--** A professional journalist does not waive the privilege by publishing or broadcasting information.
**(5) Construction.--** This section must not be construed to limit any privilege or right provided to a professional journalist under law.
**(6) Authentication.--** Photographs, diagrams, video recordings, audio recordings, computer records, or other business records maintained, disclosed, provided, or produced by a professional journalist, or by the employer or principal of a professional journalist, may be authenticated for admission in evidence upon a showing, by affidavit of the professional journalist, or other individual with personal knowledge, that the photograph, diagram, video recording, audio recording, computer record, or other business record is a true and accurate copy of the original, and that the copy truly and accurately reflects the observations and facts contained therein.
7) Accuracy of evidence.-- If the affidavit of authenticity and accuracy, or other relevant factual circumstance, causes the court to have clear and convincing doubts as to the authenticity or accuracy of the proffered evidence, the court may decline to admit such evidence.
**(8) Severability.--**If any provision of this section or its application to any particular person or circumstance is held invalid, that provision or its application is severable and does not affect the validity of other provisions or applications of this section.
**Credits**

from disclosure under both the First Amendment to the U.S. Constitution and Article I Section 4 of the Florida Constitution.

The government represented to the Court that it was using a "filter team" to review items prior to providing documents to the investigative team. The status report provided contains no report from the filter team, nor does it contain a summary of items not produced due to privilege/constitutional protection or the protocols deployed for filtering. See, e.g., *In re Sealed Search Warrant & Application (Korf)*, 11 F. 4th 1235, 1249 (11th Cir., 2021) "If the government identified seized [privileged materials] *the warrant outlined a protocol* that would be followed concerning the handling of those materials" (emphasis supplied). Document 49 does not appear to include either a copy of the filter team report or the protocol provided by the Court or the affiant about how the filter team was to identify and protect privileged and Constitutionally protected materials, as well as the legislatively protected materials of Ms. Hurtak.

---

Added by Laws 1998, c. 98-48, § 1, eff. May 12, 1998. Amended by Laws 2023, c. 2023-8, § 20, eff. July 4, 2023.

Fla. Stat. Ann. § 90.5015 (West)

4. **Unexplained Alterations of Returned Files**

As noted in our addendum to the government's summary, most if not all of the files "returned" to Mr. Burke by the government are either unusable or have been modified. Most significantly, most of these files have "file creation" dates dated AFTER the date of the execution of the warrant - in many cases months after the date of seizure. Obviously, Mr. Burke did not "create" these documents after the government seized them.

The most likely explanation is that the government, instead of creating a forensic copy of the files it returned using approved forensic hardware/software like OpenText(™) EnCase Forensics (which would have preserved the original file creation date) somehow copied the files in bulk to a medium, preserving instead the date the files were copied (not actually created) instead of the original file format. It also seems likely that no bit-by-bit comparison was made between the seized files and those returned, and as a result, the returned files cannot, for example, be sorted by date, and cannot be assumed to be accurate. There may be some other explanation for the alteration of the data, but we cannot say that the files were "returned" in forensic form.

By way of example is the fact that many of the returned files contain creation dates that neither reflect the date they were created nor reflect the date they may or may not have been copied by the filter team. For example, thousands, or maybe even hundreds of thousands of files all have a modification date and time of 2:09:59 PM on April 15, 2020.



One such file (of thousands) is this image about the war in Ukraine from February 21st, 2023, which nonetheless was set by someone to have been modified to almost three years prior (and done so, apparently, on September 13th, 2023). As a result, while the files are accessible, simple features like

sorting by date, or finding files within a particular date range is impossible. Clearly the method of copying was not done in a forensic manner.

### 5. **Unusable, Corrupted, or Modified Data**

As our comments to the government status report indicates, in many cases, the devices returned were not working, or the data either corrupted or unusable. Thus, files taken from an Apple device were formatted by or for Windows (™) PC in a way that made them unrecoverable. Much of the data seized was originally formatted for a "RAID" server -- a Redundant Array of Independent Disks, which is a data storage technology that combines multiple hard drives into one or more logical units. In order for a RAID server to be forensically reconstructed, all components of the RAID server must be available, since the RAID server treats them all as a single logical drive. While bits and pieces of the RAID server and data have been returned, because of the original configuration of the server, the data returned is mostly unusable. In other cases, Operating System files have been deleted or removed, or are otherwise corrupted - meaning that data on these drives is not accessible. While the file may have been "returned" it was not "returned" in a usable manner.

Similarly, files with the .SQL extension contain code written in a certain language; the Structured Query Language (SQL). [3] As with the RAID structure, the SQL database must be copied in a specific manner in order for the data to be usable. The .sql files returned were unusable and may have been corrupted.

In the case of the Internet router seized (which contained no data relevant to the offenses), the returned device was corrupted and unusable -- the boot drive (what causes the router to "boot up") was missing, and the system files either modified or corrupted in a way that makes the router unusable. Similarly, the boot drive for the DirecTV video server was returned in a way that was heavily modified (with apparent installs of "snaps" - small Linux pieces of software), with install dates ranging from May through July 2023.

The same is true with respect to the "Time Machine" files. "Time Machine" is a proprietary Apple protocol for making forensic backup files

---

[3] Most of the websites on Mr. Burke's server ran WordPress, an extremely common CMS (content management system) that stores the website content in a MySQL database, which gets called by the PHP script. By way of example, the Burke Communications homepage, index.php runs a script that, when loaded in a web browser, makes a request to the server's SQL server to retrieve the content of that site, including the homepage and everything that is linked to from that homepage. The complete structure of the site itself exists as data in the database, not in the web folder. Therefore, to migrate or recreate Mr. Burke's live website, it is imperative that the government return the full SQL database related to that site.

on a Macintosh computer. First introduced by Apple in 2007, the Time Machine software is designed to work with both local storage devices and network-attached disks, and is most commonly used with external disk drives, and makes "incremental" copies of data on the computer's hard drive. However, it appears that the government formatted the Apple Time Machine file copies with a Windows based utility, and the data is no longer accessible.

### 6. General Comment on Forensics

The standard and approved method of forensically copying data is to make a "bitmap image" of the device or drive to be imaged in such a way that the "copy" is a "duplicate original" of the original AND in a way that prevents the software from making any alterations to the original - seized -- drive, such as a physical or logical "write blocker."[4] In effect, the new drive is a duplicate of the old one --- with the exception that, if the new drive is larger than the old one (say a 512 Mb drive copied to a 1 Tb disk) the software should create a 512 Mb "partition" on the 1 Tb disk - essentially a "folder"

---

[4] Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations Computer Crime and Intellectual Property Section Criminal Division, p. 202; FBI Digital Evidence Policy Implementation Guide, January 3, 2014, Section 3.3.1, p. 19

containing the forensic files.   Because of the need to ensure that the copies are identical, it takes from 3.5-4.5 hours to fully copy and validate a 1 Tb drive.  Thus, if working sequentially, it should have taken a total of 45 hours to forensically copy the 10 Tb of data seized from Mr. Burke.  It has been 195 days since the government seized Mr. Burke's newsroom.  Undoubtedly, the need to have the filter team examine all of the files before providing them to the investigators (applying the court approved protocols for privilege) would slow down the investigation, but this should not have slowed the process of copying.  The government could have (and we suggest should have) simply made a forensic copy of all of Mr. Burke's seized data, and returned it *in situ.*  Unlike cases involving the seizure of classified information, or Child Sexual Abuse Materials (CSAM), or obscene materials which are literal "contraband" and may not be legally returned, there is no credible allegation that it would be unlawful for the government to return to Mr. Burke his own reporting materials. The government has made no claim that the journalists' materials are subject to civil or criminal forfeiture, and despite the government's assertion of their evidentiary nature, no precedent exists that we know of that possession of unclassified information by a journalist is an offense.  As a result, the government could have simply

copied and returned all of the drives and data, or - if they wished, could have deleted, masked, or encrypted specific files which they could demonstrate could not lawfully be returned. This would have been both forensically defensible and significantly faster than the piecemeal approach to data return.

### 7. General Comment on Data Return

A final comment on the return of data. It is not clear from the government's status report whether the government has kept, or intends to keep copies of the materials returned to Mr. Burke, or whether the materials "returned" to Mr. Burke are the original files and the government has not kept a copy. While some of the data files indicated that they were "RETURNED and information deleted from government systems, 10-6-2023," it is not clear whether this means that the government has retained the original drive (with the data) but simply removed a copy of the data from government systems, or whether the government truly has no copy - either with the filter team or the investigative team, although we believe this to mean that what was returned was the ORIGINAL document/drive, and therefore this means that the government does NOT have the returned data. Mr. Burke's position remains that the government is not entitled to retain

copies of ANY materials which are not both temporally and subject matter wise within the scope of the warrant and its probable cause findings. The filing suggests that the only records the government currently retains are those which are evidence of the two specified crimes within the specified time period (as defined in Attachment B to the warrant), but Mr. Burke respectfully requests that this be clarified.

**WHEREFORE**, Mr. Burke renews his request for a hearing pursuant to Rule 41(g) to determine precisely what materials the Government has retained, in what condition the materials are being maintained and/or copied, and when or if, they will ever be returned to Mr. Burke. Without this specificity, it will be impossible for the Court to adequately monitor the government's progress and its position regarding retained materials to make a judicial determination of when and how to intervene in the Government's process.

Respectfully submitted,
*s/Michael P. Maddux*
Michael P. Maddux, Esquire
Florida Bar # 964212
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 32606
Phone: (813) 253-3363
Fax: (813) 253-2553

Mark D. Rasch
Law Office of Mark Rasch
Member, MD, MA, NY Bar
MDRasch@gmail.com
(301) 547-6925
*Pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on **November 28, 2023**, a true and correct copy of the foregoing document is being electronically filed and will be furnished via CM/ECF to: Jay Trezevant, Esq. U.S. Attorney's Office Middle District of Florida Tampa Division 400 North Tampa Street Suite 3200 Tampa, FL 33602 at jay.trezevant@usdoj.gov.

*s/Michael P. Maddux*
Michael P. Maddux, Esquire
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 32606
Phone: (813) 253-3363
Fax: (813) 253-2553